316-0473, Next Door Storage, LLC and Wolf Row Storage, LLC Appellants Across Appellees by Pamela Davis-Rakowski v. DSW Enterprises, LLC and Daniel Wheaton, et al. Appellees Across Appellants by John Armidellis May it please the Court, Mr. Armidellis, Ms. Vosky. This case arises out of the purchase by plaintiffs of commercial real estate from the defendants. The property was used for outdoor storage as well as outdoor storage for restoring RV vehicles as well as self-storage for their buildings with lockers. The purchasers intended to use it for the same purposes as the defendants. The zoning ordinance in place said that lock coverage could not exceed 50% of impervious surfaces and that includes buildings, blacktop, asphalt. You could get lock coverage up to 60% coverage if you ask for a variance, but that had not been granted to the defendants. At the time of the purchase? At the time the plaintiffs sought to purchase the property, did it have the variance? No, Your Honor. Right. So the defendant sellers had developed it back in 2000 and ongoing until the date of sale and had developed the southern parcel and it was developed up to 65%. There was a northern parcel that was basically vacant. There was some kind of arrangement that wasn't in writing between the county and the defendants that they could have the lock coverage on the southern parcel be at 65% assuming that the northern parcel stayed vacant. They sort of linked the properties together for that usage and they sort of borrowed lock coverage from one parcel to the other. The defendants sold the property to the plaintiffs without disclosing this arrangement. The arrangement wasn't, this agreement or whatever it was, wasn't in writing. It wasn't in the zoning file. You couldn't tell by looking at the zoning file that there had been some kind of agreement about lock coverage. So you couldn't independently verify that? It had to be based on their representations? We could not verify. The court found that there were inaccuracies in the affidavits at the time of closing and that those inaccuracies could not be easily ascertained. And the evidence was by even the county officials that you couldn't tell by looking at the file that they were almost relying on memory back to 2000. So the plaintiffs let the defendants know that they intended to expand self-storage, that they wanted to expand to the northern parcel, they wanted to add more buildings so that they could increase visibility and be close to a main road off of the northern parcel. The plaintiffs let the defendants know that. And despite this, even though the defendants knew that the plaintiffs intended to expand the self-storage, they didn't let them know that one parcel was overdeveloped at 65%, another parcel could not be substantially developed, and that the northern parcel couldn't be sold off separately. The trial court initially directed verdict in favor of the defendants on plaintiff's claim for fraud and negligent misrepresentation. So the case went to trial on bench trial before Judge Rickman on just a breach of contract claim as to lot coverage. Judge Rickman found that defendants breached the contract, that there were inaccuracies in their affidavit, that we couldn't ascertain them. The court also found that the plaintiffs didn't adequately prove damages and so entered judgment in favor of the defendants. The court denied the defendants' motion for attorney's fees as well as the plaintiffs' motion for attorney's fees. So looking at the contract, and the court specifically noted the affidavit, and the affidavit that the seller has executed on the day of closing says that the current use of the properties is permitted under the zoning laws. So the first breach is that the current use of the properties was not in compliance with the zoning laws, because the zoning laws said that the maximum lot coverage could be 50%, and it was 65% of all the parcels. So it was not in compliance with zoning laws. Secondly, under the contract, the defendants had a duty to disclose any limitation on the proposed use of the property. Under the real estate contract 710, at the end of it, in warranties, representations, and covenants of sellers, and this survived the closing under a different paragraph, the seller states, sellers have not entered into and have no knowledge of any agreement of any kind, either written or oral, with any governmental official, agency, or body with respect to the revision or variation of any zoning requirements. So under this, if they had some kind of oral agreement with the county that one parcel would be overdeveloped and the other parcel could not be developed, they had an obligation to disclose that, and they did not. So the plaintiffs argued, the defendants argued, the defendants argued that the plaintiffs knew of this problem. But first of all, the defendants admit that they didn't disclose these problems. The defendants told the plaintiffs, that he could actually build 32,000 more square feet of building. And on cross-examination, the defendant admitted that he didn't also tell him to do that. You have to get rid of the outdoor storage or remove other buildings because the lot coverage was filled up. And it was clear that under the situation that nothing else could be built unless something was removed, except there was some room for a little development. The plaintiffs, the defendants, argued that the plaintiff well knew of this limitation on the property. And they say this like on page 8 of their cross-reply brief and elsewhere. Plaintiffs were fully aware of the limitation of the properties as they stood on the day of closing through their previous meeting with their engineer, Mr. Allen. And they cite four pages, 239 and 313, 1000 and 1001. And so they're intimating that the plaintiff's engineer, Jeff Allen, somehow told them about this arrangement. And if you look at those pages, and some of them are copied verbatim in the defendant's cross-reply brief, Mr. Allen and Mr. Murphy agreed that Mr. Allen let Mr. Murphy know that there was a lot coverage, maximum of 50%, or it could go up to 60% if someone got a variance. And so he explained that. But there was no testimony by anyone that anybody told the plaintiffs that they couldn't expand the property significantly. What's our standard of review? Because really, I mean, you prevailed on breach of contract. Okay, and so you're defending that right now. Okay, and you're defending the crossing deal. I'm defending the crossing deal. Right, and so what's the standard of review to uphold the trial court's finding of breach of contract? I guess it's manifest way of the evidence, and there's evidence to support the trial court's finding. I think it's that. And that's what you're pointing out now, is that there's evidence that supports that conclusion. Right. I have one more point. And the other point we want to make about this is that the defendants never tried to get a variance to get coverage up to 60%, and there was testimony that they didn't want to take the risk, didn't want to battle with it, that perhaps there would be some objections. And I'd just like to point out that if they had gone ahead, if the sellers had gone ahead and tried to get the variance before closing, and it was denied, then it would be a record, and it couldn't be hidden, as it was in this case. On our pool, the trial court found that we hadn't proved damages because the trial court found that because the defendants were eventually able to get the lot coverage up to 80% that the defendants weren't damaged. The court said that our measure of damage that we saw and had evidence on of the difference in fair market value between the actual price paid and the value of the property as it was sold under the existing limitations, that we weren't entitled to that because we were able to remedy, to use the word, mitigate the damages. And so... But mitigation of damages doesn't mean elimination of damages. The court... You just disagreed with the court on the measure of damages, but the court didn't find that there was no injury. Correct. Correct? The court didn't find there was no injury. The court found that the proper measure of damages is the cost of remediation, and rejected our contention that the proper measure of damages is the difference in fair market value between what was paid and what was actually worth. Why don't you speak to the damages? Yes. So... I hope I'm not messing you around. Can I just point out that the damages... The question of the measure of damages under the Illinois Supreme Court is a question of law. So the trial court doesn't get to pick and choose between measure of damages. He doesn't get to say, well... The trial court shouldn't be able to say, I think the measure of damages in this case is the cost of remediation, even though you have valid proof that there was a difference in fair market value and that you paid more than fair market value, that what measure of damage is to apply is a question of law. And so the purpose for that is so that we have consistent results. The measure of damages in Illinois for breach of a real estate contract, and it's pretty well universal, is that it's the difference in the fair market value between what was paid and what its value was on the date of the sale. Our expert testified that given the limitations on the date of the sale, and those limitations were that the northern parcel couldn't be sold off and there was no more significant development available, that it was $485,000 less than what we paid. Those are damages that we proved. We proved that we were injured by the breach, and we proved that because of nondisclosure of these, that they breached, and because of the nondisclosure, that the property value was worth less than what we understood it to be because we expected to be able to develop it. The trial court and the plaintiffs argued that the measure of damages, the difference in fair market value, can only be the measure of damages if it can't ever be remedied. If the breach can't be remedied, then we entitle it, according to the trial court, to the difference in fair market value. You said the defendants argued that. You said plaintiffs earlier. Okay. This is the defendants' position. Plaintiffs argued the difference in fair market value. The defendants and the trial court found that you couldn't get the difference in fair market value if the breach, you couldn't get the difference in fair market value if the breach could be eventually remedied. So the plaintiffs were able, through their work, after purchasing the property, to take the risk to go and get the variance to request more lot coverage. And after 11 months, they got approval for that. So they did the work. They made the effort to get the variance and to get increased lot coverage. And that doesn't have anything to do with what the value of the property was on the day that it was sold. Two minutes, please. So the plaintiffs were damaged. They paid $485,000 more than it was worth on the day it was sold. And we know that the fact that these limitations existed must have affected the fair market value or else the sellers would have disclosed these limitations, that you can't develop it anymore. And they would have complied with their agreements under the contract. Under the restatement of torts, the measure of damages is the loss in value to the non-breaching party based on the breach, and that's the $485,000. Plus, under the restatement, you would be entitled to cost remediation if you could prove that. So the restatement doesn't say you pick and choose. It says you pick a ward based on the evidence that the non-breaching party should be, put it whole, and we could see the difference in fair market value plus cost remediation plus loss of profits if we could prove that. And so the trial court erred as a matter of law in finding that the only recoverable damages was the cost remediation and not the difference in fair market value that was clearly established by our expert. Does that seem apparently fair? Our decision? Yes. Well, I... You did have to go to cost of getting the, actually being legal, okay, and putting together these parcels to serve the purpose of the purchase of that property. And you did incur expenses, which the trial court recognized, but then didn't give you because they said it wasn't, he said it wasn't adequate proof. But when the day is done, the property is being used as the intent for the intent and purpose of what you purchased it for. Is that correct? It took a year to get there. Okay. It was the plaintiffs who took the risk of getting the variance. And when you have property for sale, the entitlements affect the fair market value. So when they sold it, I think that it's almost uncontroversial that the fair market value was less than what we paid on the date of sale. And that the court in the post-judgment motion found that the defendants actually made misrepresentations. So if... Yeah, they said there was a breach. You're going back to another issue. We're here on damages now. So we proved through our evidence that was uncontroverted that we paid $485,000 more than it was worth on the date of the sale. And you can't look... What we did later doesn't affect that date. Your stronger argument would be everything after that date of purchase was a development cost that you incurred to get the property to the point that you intended it to be at the time you bought it. And so therefore, they shouldn't get the benefit of your development. They shouldn't get the benefit of our work. We've been saying that. I would just argue that it's development. I mean, people buy raw land at a fair market value with the intent of putting a piece of a building on it. And after the purchase, they improve the property. Right, but if it's raw land on the date of purchase and it's owned agricultural, it does not have the same value as if it was owned industrial, which is the eventual purpose. That's your argument. That's what our evidence is. It's the only evidence in the trial court that because these entitlements were not in place on the date of the sale, that the property... Well, it's the argument as to why that as a principle of law is fair. I'm sorry, I didn't hear the last word. I know what the evidence is, yes, but your argument... In answering my question, does it seem fair, you would say, no, it is fair because... It is fair. It was the defendants who got a windfall. They got more money than the property was worth. And after we paid, we paid more than it was worth, they got more than it was worth, they got the windfall. We're the non-breaching party. It's a breach of contract and we should be entitled to our damages of having paid more than the fair market value. Why does a purchaser have a duty to mitigate in a real estate contract? Is there any case law that says that? No, Your Honor. I would think it would be the seller. The seller should cure the defect by getting the zoning changed, but what you bought was land that had too many buildings on one lot, and they would have had to come down even to use that lot, correct? And then the other lot could not be developed, was that the way it was? Limited development. So you increased the value of the property after the date of purchase? Correct, and it's the defendants who got the windfall. Were the defendants requested to fix the issue? The defendants were requested, according to the testimony, to come to the county with the purchasers and try to help sort it out, and they just walked away from it. Just to answer your question, although I'm over my time, it's clear that the purchaser non-breaching party doesn't have any duty to mitigate. We cited some case law that, for example, if there was a breach of contract and the other side said, well, you could have done this and you could have done that to mitigate damages, but the purchaser does not have a duty to fix the breach under the guise of mitigation. And so mitigation does not apply here. And I think the defendants... You just elected your remedy. You could have elected the remedy to back out of the contract completely, I would think. I mean, I'm not a real estate lawyer, but I imagine that. Thank you. May it please the Court, John Argidellis on behalf of the cross-appellant, Ms. Wachowski, Ms. Bosky. Appreciate the opportunity to be here today. I'd like to get the issue of damages first since it's the first thing in my mind right now. But when Ms. Gorkowski articulates that the proper measure of damages is the difference between the fair market value and what they paid for at the time of closing, she omits what all of our case law says thereafter. And I'll quote 1472 North Milwaukee LTD v. Feynman 2013 ILAP 121 191. The requirement of establishing fair market value on the date of the breach relates to the proposition that a damage award should place the non-breaching party into the position he would have been had the contract been performed, but not in a better position. The compensation awarded in the breach of contract should not provide plaintiff with a windfall. Damages should be based on some measurable criteria and not based on guess, speculation, or conjecture. And I think that goes to your question of whether it's fair. So the first part of that is perhaps you would look at that difference, but then you also have to look at are we giving a windfall to somebody? Are they being put in the position they would have been put into? So the criteria that the courts have set, that Illinois law and all of our courts have set forth is the overriding principle is to make the person whole, not to provide a windfall to them. And that's what they're asking for. What happened in this case was... So if they hadn't done anything and just wrestled with whatever property they got and the limitations on it, your argument would be irrelevant. Well, we're going to get into the limitations because there were no limitations whatsoever on the property. What they have constructed... What happens in the cases where in the cases even quoted and cited by the appellants, in those cases it was situations where I'm trying to buy a piece of property for a million dollars and the closing doesn't even occur because the seller decides I'm going to sell it to this other guy for 1.2 million dollars. Then the measure of damage is the difference between the fair market value and what they would have paid for it. They would have made 200 grand if they had bought it, been able to buy it and then sell it for the 1.2 million dollars. There's no other way to measure damages there. That's not a windfall. That would have been their damages. So in that very straight and narrow case, it's easy to just use the first part of that measurement. But then in a case like ours, in our case, they intended, based on the evidence, the best evidence was they intended to get a 60% lot coverage ratio on the northern lot. They achieved an 80% lot coverage ratio. So they got more lot coverage than they intended and they wanted an extra half million dollars to boot as damages by focusing just on the first part of that measure of damages. That is a windfall. And that is what our courts have said is not appropriate as a measure of damages to grant them that windfall. Now, as has been articulated by some of the justices here and was as articulated by Judge Rickman in the trial court, in this case because they ended up getting more than the benefit of what they were intending, then perhaps the true measure of damages would have been, what did it cost them to get there? Not that they had a duty to mitigate. We never argued they had a duty to mitigate nor did the judge say they had a duty to mitigate. But in light of the fact that they were able to achieve greater lot coverage than they intended, based on the evidence, then the proper measure of damages in this case was what did it cost them to get there? They chose not to put any evidence on with regard to that issue because they wanted the court to focus on this windfall of damages, which is conjecture, which is speculation, and which is guess. Their expert testified as a 65% lot coverage as to how she measured the damages. As existed on the date of closing, it was a 50% lot coverage. As intended, as best we could ascertain from the evidence by the Murphys, they wanted a 60% lot coverage. They achieved an 80% lot coverage. The 65% lot coverage that their expert testified to was neither what existed, what was intended, or what they achieved. There was no measure of damages based on any of the actual things that occurred, but this 65% ratio that I'm not sure where it came from. So all the testimony, and all that expert witness' testimony was a conjecture, well, if we assume 65%, here's how I would measure damages, only looking at the difference in value based on the date of closing, and not looking at what was actually achieved in this case. And that's why the court correctly said I'm not going to give you a $500,000 windfall, but had you bothered to put on evidence of what it cost you to get to 80%, I would have given you what it cost you, engineering fees, lawyer fees, whatever it cost. And I think that's right. I think the judge got that right, and I think that's consistent with all of the law being cited by both parties. What is your position on damages? Are you disputing the amount? No. We do not believe that any breach occurred. And I'd like to address that issue if Your Honor would like me to. You're seeing damages as an element of the cause of action. I'm sorry? You're seeing damages as an element of breach of contract. Yes. But there was no breach of contract. Because here's the thing that the only if we read the briefs, and everything that we have in there, and all these are two physical lots that are two pins. And to the extent we know real estate law, and I assume Your Honors do, I know I do, I know Ms. Borkoski, I apologize, she's not a real estate lawyer, but they're two separate pins. But for all purposes, at all times, these were treated as one piece of property. All of the evidence showed it was seven and a half acres when you combine the two parcels. Every zoning approval, every zoning application, the engineer, their engineer, that they consulted with prior to closing, their expert witness, Mr. Tonelli testified, yep, always treated as one parcel for zoning purposes, seven and a half acres. As it sat on the day of closing, it had a 50% lot coverage. That the buildings were concentrated on the southern portion, on the southern pin, if you will, had nothing to do with it. They had a 50% lot coverage on seven and a half acres. It was one lot in the eyes of the county. The county testified. Brian said, seven and a half acres, 50% lot coverage, there's no violations as of the day of closing. That was what we approved. They had built eight of the 11 buildings. So in fact, they could only get the 50% lot coverage had they built all 11 buildings. They had only built eight of them, which means the actual lot coverage on the day of closing was something less than 50%. So there was no breach. There was no violation. At all. The only people, and this is what happened here, what happened was Mr. Murphy, the appellant, thought, well wait a minute. How can I maximize my lot coverage here? Well, if I can cut the southern parcel off and treat it separately and ignore the buildings built on there, then I'm going to go to the county and I'm going to demand that I get another 50% on the northern lot. That's what he did. And the county told them, we're not going to agree with that. We're not going to allow you to do that. They've always been treated as one parcel for all of these zoning purposes. And the fact that the 50% lot coverage was focused on one part of the property than the other has nothing to do with it. They argued about it. He did not file for variance to get his 80% for eight months. Eight months from closing, for eight months, he argued with the county trying to force them to give him excessive lot coverage on what he was now separating out as a northern lot. The only person in the history of these properties to ever have done that. And they said, no, we're not going to do it. Apply for the variance. He finally applied for the variance. Within three months, he was granted 80% lot coverage per parcel. Far in excess of anything he had ever contemplated. So, the plaintiffs, the Murphys, they chose this path. They chose this path to try to maximize the lot coverage. Why they have come back to my clients and why they litigated this since 2010 is, in my opinion, as articulated in our brief, is a long litigious renegotiation of the contract price due to global events. This deal closed in November of 2008 and I'm sure that the value and the price they paid in 2008 changed or at least in the eyes of their bank probably changed quite a bit after that and they decided they were going to try to make this run at us to make themselves whole and renegotiate the price. But there was no breach. And further there was no breach. Not only was the property in compliance with the zoning ordinance as of the day of closing, as testified to by their expert finale, the county representative, Brian Radner and Jeff Allen, but they didn't comply with the contract. Another element of breach of contract is that they have to be in full compliance. As we pointed out in our brief, in sections 2.11 of the contract and section 9.01 of the contract, they had a duty to tell us there's a breach and give us our opportunity to cure under those terms of the contract. In fact in 9.01 it says if you find a breach of contract after closing, you have to give us a 10 day notice to cure before you can follow any of your other remedies. They never did. There was some vague argument that, well they knew, we kind of told them to come to the county board. They didn't present any email, letter, text, Facebook message that said, pursuant to 9.01 there's a breach of the contract, here's your 10 day notice to cure. They did not comply with the contract. Therefore, that second element, or that third element of proving a breach of contract, that you are in compliance with the contract, they failed it. And yet the court found in favor of the defendants across the board, and then says very vaguely, and this is where the breach of contract is against the manifest way of the evidence, because he says very vaguely that probably hard for me to find it, but essentially he says there was a breach of contract with regard to lot coverage as articulated in the seller's affidavit. That's all he says. He doesn't say specifically he asked anything. Well the seller's affidavit, not the contract as argued by counsel, but the affidavit is where he found the breach. And that's what we have to look at. We can't re-argue the case as to what it said in the contract and what it said here, as far as what the court found as a breach. But the court found the breach in the seller's affidavit. The seller's affidavit doesn't even use the term lot coverage. The terms of the seller's affidavit in essence when boiled down say the property is in compliance with the zoning ordinance as of the day of closing, and we've received no notice of any violations. 100% true. 100% true as testified to again by their expert witness, by the county representative, by their engineer. Yep. They have 50% lot coverage as to the 7 1⁄2 acres as a whole. There was no over building on the site. So there's no breach. There's nothing to support the court's conclusion, the trial court's conclusion that there was a breach. There's not a shred of evidence or testimony that says anything. He says in their seller's affidavit it's not in there. There's nothing in the seller's affidavit that says anything about lot coverage. There's no representations as to what you can do and what you can't do. And in fact they could always do everything they wanted to do. The properties were not limited. It's just what you wanted to do. You could build 50% lot coverage as a matter of right, which means they could have built out the rest of the 11 buildings that my client had approved. They could go for a variance to get a 60% lot coverage, which was called an administrative variance. Or they could go for a full variance and get as much lot coverage as they wanted, which they eventually did. They went for that. They got 80% lot coverage. So what was the limitation? And on top of that, the evidence was clear that they met with Jeff Allen, the geotech engineer, on November 13th prior to closing, and his testimony as quoted in our last brief was that, yep, I told them about the 50% lot coverage, I told them about the 60% lot coverage, I told them how they could get more lot coverage, I told them about the existing build out, what existed, how it was done, about the storm water. They knew all of that. They knew all of this. And they're arguing that somehow, oh we were hoodwinked and we didn't tell them anything. They got it from their own engineer. A week before closing, they heard everything they needed to know about the peak, the engineer testified that, and Mr. Murphy admitted, yep, I had that meeting, yep, we talked about the plans, yep, we talked about getting lot coverage, and Mr. Murphy said to his engineer, draw me a plan that gives me 60% lot coverage on the north lot. Now if you're asking your engineer to get 60% lot coverage on the north lot pre-closing, you were already saying, I intend to go seek a variance. Because to get 60%, you had to seek a variance. So all of this, well we had to go through all these hoops for 11 months to get more than 50% lot coverage, that's what they intended from the get-go. The testimony says it. Murphy says yes, I told them, 60% lot coverage. The engineer, yep, he directed me to draw a plan for 60% lot coverage. So in the very, before closing, they intended to apply for a variance and get more lot coverage than what they were allowed by right. Two minutes, please. Thank you. I need a breath of air. You're supposed to be asking me questions at some point. Not everybody feels that way. Thank you, Your Honor. So, it's hard for me, we've struggled throughout the case, is that why when you buy a piece of property, you knew everything about the property from your own engineer, you intended to get variances to maximize the lot coverage, why would you bring this lawsuit against us? You got everything you wanted, and more. And again, we come back to the only issue that could possibly be out there was that, in light of the 2008 real estate crash, that somehow their bank was putting pressure on them or some other issues were going on. I'm sorry? There's no evidence of that. That's just, we're summarizing. So, I think it's rare to find that a trial court's ruling is against the manifest weight of the evidence, but it's also clear from the record, there is absolutely nothing in the seller's affidavit, which is specifically what that trial court points to, that discusses or implies anything about lot coverage. And then the generalized statement that the lots were not in compliance with the zoning ordinance at the day of closing is completely controversial by the testimony of Rodney Tonelli, their expert witness, of Brian Radner, the county planner who testified, and by their own engineer, Jeffrey Allen, all of whom have testified, and we've quoted that language verbatim, all of whom testified that the property wasn't compliant with the ordinance as of the day of closing. But that's considering both pieces together. Wasn't the southern parcel, wasn't there 65% lot coverage on the southern parcel? So when you say there was only 50%, you are thinking of both properties together. Because if you look at the testimony of the gentleman I just quoted, all of them said, up until Mr. Murphy came along, the properties were always taken together. Nobody ever applied for any sort of zoning or development. No one ever discussed it separately. In fact, Jeffrey Allen, their engineer, says when we designed it, we designed the storm water to serve both properties together because we've never contemplated separating the properties. The first and only person to contemplate separating them was Mr. Murphy, the appellant in this case. They created the whole issue of them being separate parcels. The whole 65% lot coverage, no one, even the county, didn't look at the southern parcel and say, hey, you have 65% lot coverage. The county says you have a 7.5 acre... But we don't know why they did it. We don't know why they didn't. The zoning officer could have come and said, done the same thing. Looked at both properties and said, you've got 65 on this one, got to do something about it. No. Judge, I apologize, but I'm going to tell you you're wrong on that and I'll tell you why. The county approved the plan on how the buildings are going to lay out, including the fact that most of them are going to be on the southern parcel. They approved that as a total 7.5 acres. There was an ordinance. Educate me. Approved the plan. In 2000, year 2000, my clients, the defendants, developed a plan to build 11 self-storage buildings on the totality of the property. The county approved that plan by ordinance. Does that plan apply to the purchaser's use of the property? It applies to the property, Your Honor. When an ordinance is approved with regard to a piece of real estate, it quote-unquote runs with the land. That is how the land existed. That was what the county was committed to by law, by their ordinance. They were committed to abide by that. They could not go back on that plan. They've approved it. Mr. Murphy, in fact, the testimony was that he had received copies of the ordinance prior to closing as well. He was well aware that ordinance existed that allowed my clients to build what they built. There was no side agreement. There was an approved plan for the stormwater on the southern portion to put more of the buildings on the southern portion rather than the northern portion. That was the approved plan that they were well aware of, that Jeffrey Allen, their engineer, testified he went over with them. As I said, it runs with the land. Even though the actual buildings were not 11 buildings to go up to that 60%, right at the time of the sale? The 11 buildings, had they all been built out, would have been a 50% lot coverage as the entire 7 1⁄2 acres, but only 8 of the 11 were built as of the time of closing. I understand that. Treating those two separate things as a unit. Yes. They were approved to go up to what percentage? It's 50%, Jeff. Oh, 50, okay. Yes, so the approved plan that we had partially built out allowed... Higher than 50 would have required to get an administrative variance. 60% and then a full variance which would go... The full variance means you have to go in front of the whole county board to get that. Right, and that could go up to what percentage? Well, they achieved 80%. Okay. I guess any percentage the county is willing to grant them. Okay. Do you want to speak to the... I'm sorry. No, I was just going to close, Mr. Archibald. Would you speak to the attorney fees issue? You are saying there was not a breach. Well, I believe, Your Honor, that if this court were to find that there was no breach, then we would be entitled to our attorney's fees, which states that the prevailing party in this, under the contract, it's section 10.12 states that the prevailing party in any litigation would be eligible to would get his attorney's fees, I guess, from the losing party. Judge Rickman though said there's no winner here. Is that correct? Yes. He said there's no winner. How can there be no prevailing party? Well, and we argue that as well, because even if this court were not to reverse the breach, they, the judge, the trial court did say and I don't have the exact, I'd have to look at the order, but he says essentially that we won, but there's no prevailing party for purposes of attorney's fees, and he said because we found this breach that had no damages attached to it, which again, we don't believe there's a breach, but even if we find this breach, the fact that they sued us for $500,000 plus and the fact that the court found on five of the six points, two points on misrepresentation, two points on fraud, and two points on breach of contract, that five of those six points by directed finding, we prevailed. And that they only prevailed on this technical breach of contract with no damages attached to it, I still think we are deemed the prevailing party under those circumstances as some of the cases we cited. It doesn't have to be 100%. If we prevailed on most of the substantial issues as we did, we are still the prevailing party, and we should still get our attorney's fees. Thank you. Thank you so much. I'd like to talk about the breach for about two minutes and about damages for three minutes. The contract between the parties has listed these properties as two separate properties. Each piece, each parcel, each of those two properties are sold by different LLCs to two different LLCs. They're treated differently under the contract. If there was an agreement with the county back in the day that we're going to treat those as one, and therefore we're going to take the lot coverage from one and borrow it from the other, it's not in the zoning record. It's clear. If there was any kind of approval of this plan, it's not in the zoning record. Under the contract, they had a duty to disclose it. Council's position that, well, this was always treated as one parcel, and that's how we always treated it, and that's how the county treated it. They had an obligation to disclose any kind of oral or verbal or written agreement with the county that varied the zoning requirements, and the zoning requirements said that a parcel can't have more than 50% zoning lot coverage. I don't think there's any question that there was a breach. There's no evidence that there's no written evidence anywhere that the county approved any kind of plan regarding this property. It's clear at trial that the people from the county said you could not tell from looking at this file what kind of arrangement had been made. And it's clear under 710 that if the defendants had some kind of verbal agreement with the county or written agreement with the county that they could change somehow the zoning requirements that they had to disclose that. The evidence is that it affected the fair market value. I think the only assumption we can make is that it did affect the fair market value because it's only testimony at trial. That given the limitation that northern parcel couldn't be developed or sold off, that the value was worth $485,000 less. There was a reason that the defendants didn't explain all this to the plaintiffs, and it was because they knew they had a problem on their hands, in my opinion. And so as far as damages, we were damaged. We paid more than the value of the property. The defendants got a windfall. The plaintiffs say that all we're entitled to is the benefit of our bargain, assuming there is no breach. And there was a breach. They misrepresented the value of the property and the ability to develop the property. They knew that Mr. Murphy intended to expand it, and the only evidence is that on the date of the sale it was worth $485,000 less than it was paid. It is fair for the purchasers to be reimbursed for that extra payment that they made based on the breach of contract. The judge finally concluded that there were misrepresentations by the defendants, and there was nothing unfair with allowing the purchasers to recoup the extra amount that they paid for the property that was based on the breach and on the failure to disclose, and really on hiding it. Mr. Murphy said, I intend to expand this parcel, and they didn't explain otherwise. Regarding the eight buildings, if they wanted to build 32,000 more square feet of building, they had to take out the outdoor storage. So they were just deceptive all the way around. We have an email in the appendix from the defendant saying that well, you can add 32,000 more square feet of buildings, and on cross-examination he agreed. I didn't tell them to do that. You have to get rid of the outdoor storage, which was an important component of the whole deal. Here the defendants breached the contract, were able to sit back and say, okay, plaintiffs, fix our breach. Good luck with that. We didn't want to try. We didn't want to try and look at the variance, but good luck with that. We were able to sell the property as if you could develop that northern parcel or sell it off, and that wasn't the case on the date of the sale. The fact that we were able to do it doesn't mean that it was necessarily certain to happen later that we could get the variance. It depended on the circumstances on the county, and there was a reason that the defendants didn't go ahead and try to get the variance. Under the state as it is, the defendants made misrepresentations, breached the contract, did not disclose these kind of arrangements that we're talking about here, and let the plaintiffs go ahead and purchase it with the idea that he could develop the other parcel. The measure of damages is fair because in a real estate contract what we're trying to do is purchase property at its fair market value. We're not trying to think, well, what can we do next year? And what might happen next year that might affect their value. That's not the rule. What we want is a consistent rule that's applied in all cases, it's consistent with what the restatement says, that a party is entitled to the loss in value that it suffers from another party's breach. That's all we're asking for. The defendants are not entitled to keep the $485,000 that was earned through the plaintiff's work for a year later. Not to mention, we couldn't open for a year. I mean, we didn't ask for profits because it's difficult to prove profits in a new business. The defendants were definitely injured and the plaintiffs were definitely injured. The plaintiffs were injured and the defendants had a windfall. And they were able to say, we breached, it's on you, and too bad we didn't let you know about this, that you have a big problem on your hands. Does the variance go with the lot, the lots, the lot, or the owners? Do you have to renew this variance every three years, five years? Is it permanent? I don't know, I'm sorry. I think that my understanding is that the variance goes with the parcel, not the owner. I think that's right. But there was no variance in place before we bought it. Thank you. One last element of breach of contract. Yes. Thank you, Judge. Just briefly on the damages or the breach of contract. That fourth element of breach of contract is proving damages, which they didn't do. Curiously, we just heard about, well, they had an open time, lost revenue. None of this was presented at trial, curiously, because I think the purpose was they were going for that windfall damage and they didn't want to cloud it up with the actual damages. But we will dispute even the trial court's conclusion that the measure of damages, I believe his measure of damages, if a breach actually occurred, was correct, the cost occurred. But in this case, because there is evidence that the plaintiffs were seeking a variance in all accounts because there's evidence that he directed his engineer to develop a plan at 60% lot coverage, that the cost of getting that variance was something he was going to incur regardless. So even if a breach were found, there are even no damages under the trial court's measure of damages because the cost of getting a variance would have been the same whether he chose to get a variance or because he got a variance because of our alleged breach. But right back to this last thing with regard to breach of contract and the secret agreements and side agreements that we were supposed to disclose, there is no such thing. I don't even know where this is actually coming from. As Justice Reines pointed out, there is an ordinance and it runs in the land. It is an ordinance that is recorded against the land. It's a public record. Their own testimony. And I had to put it in my brief because the argument is being made by the plaintiffs here. Rodney Tonelli, their expert witness. Question, okay, is this the plan that was approved in 2000 by Will County? Answer, I believe it was, yes. Question, okay, so this is the 2000 approved plan. And of this layout, 8 of those 10 buildings were actually constructed as of 2008, November. Is that correct? Yes. Question, so this was the plan that was approved in 2000 by the county and using the combined parcels, according to Geotech, it was a 50 percent lot coverage and according to your calculations, just a little bit different, 51.92, I think you said. Answer, I think that's correct. Yes. Question, but it was approved by the county, so presumably answer, yes. There is a testimony of their own expert witness. So these secret agreements, this property being in breach as of the day of closing, their own expert, just through this question and answer, stated, we had a 2000 approved plan to build 10 buildings, I thought it was 11, and we had built 8 of those buildings. I don't see anywhere we can find that the properties were not in compliance with the zoning ordinances, which is the sole basis for the trial court to find that we breached the contract. Brian Radner from the Will County Land Use Department. Question, and this is in my brief, pages 4 through 7, but Brian Radner from the Will County Land Use Department. Question, now assuming that this was the approved plan, this complies with all of those lot coverage issues, you put more buildings on the south so you have less room to put many buildings on the north, is that correct? Answer, well that's how we would look at it, correct. There's the county speaking at trial. Yep. Nothing wrong with that, it's compliance with our ordinance, that's the approved plan, you put more buildings on the south, you have less room to build on the north, fully in compliance with the ordinances. That's verbatim testimony. Jeff Allen, their own engineer. Question, okay, I'm showing you what has been marked as plan exhibit number 27, it's a May 1st 2000 general layout. Are you familiar with this document? Answer, yes. Question, okay, and this was the plan that was ultimately approved by the county. Answer, yes. I don't know what more evidence we could have presented at trial to show that the properties, there was no secret agreement, there were no side deals to develop more buildings on the south and the north. We had a May 1st 2000 ordinance of the county approving the layout as it existed as of the date of closing. So where's the breach? Where's the breach as to lot coverage? And the seller's affidavit that boiled down says we have no notices of violations in the county and everything on the land as of the date of closing is in fact in compliance with the county. We have testimony from their expert, the county, and their engineer, that you just heard, that everything was in compliance with the ordinance at that time. So truly, in this case, and I know it's real. And maybe this goes to this issue, but opposing counsel was saying that someone said nobody could find it. I don't know what it is that nobody could find, but that the file, you couldn't find it, I believe that she was saying that if a person went to the county and looked at the files, they may not be able to ascertain all of this from the county file. Okay. You'd have to consult maybe with your engineer as the plaintiffs did. You might have to consult with you know, their actual witness was an engineer as well. But a lay person may not be able to understand everything. Just like you know, as Ms. Borkowski says, she's not a real estate attorney. She wouldn't be able to understand everything if she just read it. You'd consult with an engineer as the plaintiffs did. You can't go to the county and find an ordinance in Wilkes County? I will tell you an interesting side note on this, I don't think it's pertinent to our discussion today, but actually one of the ordinances, not this ordinance, but an ordinance with regard to outdoor storage, they could not find it at the time that they were looking for testimony in the trial. So, blame it on their filing system, but I don't think it's pertinent to our case, because if we quote the testimony of Jeff Allen again, as quoted in my brief on page 7. Basically you found it, you presented evidence that it exists. Oh, it can be found. Absolutely. I think what her argument is, is if you go to the county and just grab the file and look at it, you may not have all your answers there. You need to do a little more due diligence, as I would expect the plaintiffs who own multiple self-storage units would have done their due diligence. And they did. Because Jeff Allen, their expert, testified that he sat down with Philip Murphy on November 13th and said to the best of my knowledge, we discussed the existing plans that we had worked on to date, what the processes we had gone through at the county, what was built so far, what we've done as far as stormwater retention and lot coverage was. So, kind of like a due diligence discussion. So, the plaintiffs in this case, I don't know what they found at the county, but on November 13th prior to closing, they sat down with an engineer who went through every detail of lot coverage and what was approved and what was built. That's his testimony. Thank you so much. Thank you both for your argument today. We will take this matter under advisement. In fact, with a written disposition within a short day.